UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.,

                              Plaintiff,                          18-cv-4354 (PKC)

             -against-                                                OPINION
                                                                    AND ORDER

U.S. DEPARTMENT OF JUSTICE,
including its components OFFICE OF
COMMUNITY ORIENTED POLICING SERVICES
and OFFICE OF INFORMATION POLICY,

                              Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

             On August 24, 2017, plaintiff NAACP Legal Defense and Educational Fund, Inc.

("LDF") submitted a Freedom of Information Act ("FOIA") request to the Office of Community

Oriented Policing Services ("COPS" or "COPS Office"), a component of the Department of

Justice, seeking five categories of documents in connection with a collaborative reform

assessment of the North Charleston, South Carolina Police Department ("NCPD"). (Compl.

(Doc 1), Ex. 6.) Over the course of nearly a year, defendants made incremental disclosures in

response to plaintiff's initial FOIA request and subsequent clarifications of it. In January 2018,

plaintiff filed an administrative appeal challenging certain of the agency's assertions of FOIA

exemptions. (Doc 1, Ex. 9.)

             On May 16, 2018, LDF commenced this action, alleging various FOIA violations

against the United States Department of Justice, its components COPS and the Office of

Information Policy ("OIP") (collectively, "defendants" or "the government"). LDF amended its

complaint on June 26, 2018, after subsequent communications with and disclosures from

defendants.  (First Am. Compl. (Doc 23).)  The parties have successfully resolved most of the differences between them.  The remaining issue is whether defendants have properly redacted portions of a particular draft report pursuant to FOIA Exemption 5, the deliberative process privilege.  5 U.S.C. § 552(b)(5).

Defendants now move for summary judgment pursuant to Rule 56, Fed. R. Civ. P., and LDF moves for in camera review of the document in dispute.  For the reasons explained, defendants' motion will be granted and plaintiff's motion will be denied.

BACKGROUND

A.  The COPS Office, CRI-TA Program, and NCPD Engagement

In 2011, the COPS Office developed a program to provide technical assistance to law enforcement agencies on issues including, but not limited to, officer use of force, officer-involved shootings, and the agencies' relationships to the communities they serve.  (Fieri-Fetrow Decl. (Doc 49) ¶ 18.)  This program is the Collaborative Reform Initiative for Technical Assistance ("CRI-TA").  Among the goals of the CRI-TA program is to improve law enforcement-community relations "by providing a means to organizational transformation."  (Id.)  This "organizational transformation" would be achieved via CRI-TA identifying particular issues, analyzing and assessing the agency's policies, procedures, and practices, and the COPS Office publishing a report with these findings and recommendations for resolving these issues.  (Id.)

The COPS Office would award "cooperative agreements" to "technical assistance providers" to develop plans with the CRI-TA program.  (Id. ¶ 19.)  One of these technical assistance providers is the Police Foundation.  (Id.)  The Police Foundation is a non-partisan organization that works to improve law enforcement agencies at all levels through innovation

and science.  (Id.)  In the context of the CRI-TA program, a technical assistance provider such as

the Police Foundation conducts an assessment and provides a draft recommendatory report to the

COPS Office.  (Id. ¶¶ 19-20.)  Draft reports then go through a 17-step review process before the

COPS Office adopts a final version and releases it to the law enforcement agency and to the

public.  (Id. ¶ 20.)

        After an NCPD officer-involved shooting in April 2015, the mayor of North

Charleston requested the COPS Office's assistance.  (Doc 49 ¶ 21.)  The mayor and the NCPD

had implemented some reforms in response to the shooting, and sought the COPS Office's input

in evaluating these reforms and suggesting others.  (Id.)  The COPS Office and the NCPD

entered a CRI-TA engagement.  (Id.)  In July 2016, the Police Foundation became the technical

assistance provider for the NCPD CRI-TA engagement.  (Id. ¶ 21.)

        In or around August or September 2016, the COPS Office approved the Police

Foundation's plan for the NCPD CRI-TA engagement.  (Id. ¶ 25.)  Pursuant to this plan, the

Police Foundation collected and analyzed NCPD's policies, manuals, plans, and department

statistics, conducted interviews with community members and department personnel, observed

NCPD practices during site visits, and compiled and reviewed Census data for North Charleston

and demographic data for police officer applicants.  (Id.)  The Police Foundation selected what it

viewed as the most pertinent data and information to include in its preliminary assessment and

set of recommendations for the NCPD.  (Id. ¶ 26.)  The Police Foundation's work included

creating figures, charts, and tables that combined data from multiple sources for assessing trends

in the NCPD's practices.  (Id.)

        In May 2017, the Police Foundation sent its initial draft of the NCPD report to the

COPS Office for review.  The COPS Office and the Police Foundation began the 17-step review

process, and the report was then edited and recirculated twice, for a total of three editions of the draft.  (Id. ¶ 27.)  The draft report at issue here bears the date June 30, 2017 (the "June 30 Draft").  (Id.)

In July 2017, COPS sent the June 30 Draft to three peer reviewers for additional comments.  (Id. ¶ 28.)  Upon receiving the peer reviewers' comments, the June 30 Draft was further revised in August 2017; however, the document remained dated June 30, 2017.  (Id.)  In September 2017, then-Attorney General Sessions announced changes to the CRI-TA program that resulted in the COPS Office ending its work on the NCPD project.  (Id. ¶ 29.)  The June 30 Draft was never finalized.  (Id. ¶¶ 29-30.)

B.  LDF's FOIA Request

On August 24, 2017, LDF sent a FOIA request to the COPS Office.  (Doc 23, Ex. 6.)  LDF's FOIA request sought five categories of documents "relating to grant awards and technical assistance provided to the [NCPD] or other North Charleston city officials by the [COPS Office]" from January 2007 to the present.  (Id.)  A few days later, on August 28, 2017, the COPS Office's FOIA Officer sent a letter to LDF acknowledging its FOIA request and providing LDF with the assigned FOIA case number.  (Doc 49 ¶ 4.)

On September 22, 2017, COPS provided LDF with an interim response of 58 pages of responsive records, 44 of which were released without redactions.  (Id. ¶ 6; Doc 23, Ex. 7.)  The remaining 14 pages were redacted pursuant to FOIA Exemptions 4 and 6, 5 U.S.C. § 552(b)(4) and (6).  (Doc 49 ¶ 6; Doc 23, Ex. 7.)  A few weeks later, COPS sent a final response to LDF's FOIA request, comprising three additional pages of responsive records, and withheld 331 pages of records pursuant to FOIA Exemption 5, 5 U.S.C. § 552(b)(5).  (Doc 49 ¶ 7; Doc 23, Ex. 8.)

On January 9, 2018, LDF administratively appealed to the OIP, contesting the COPS Office's response to the FOIA request.  (Doc 49 ¶ 8; Doc 23, Ex. 9.)  Although OIP acknowledged receipt of the appeal, LDF did not receive a substantive response from OIP within 20 business days, which LDF contends was a violation of the requisite time limits set out in section 552(a)(6)(A)(ii).  (Doc 1 ¶¶ 33-34.)  LDF filed its initial complaint in this action on May 16, 2018.  (See Doc 1.)

On June 1, 2018, OIP sent a final response to LDF, including a supplemental release of five additional pages of responsive material, and otherwise affirmed the COPS Office's response.  (Doc 49 ¶ 8; Doc 23, Ex. 11.)  LDF amended its complaint on June 26, 2018 to include allegations related to OIP's response to LDF's administrative appeal.  (See Doc 23 ¶¶ 35-38; id., Ex. 11.)  The COPS Office then conducted an additional search based on clarifications of LDF's FOIA request.  (Doc 49 ¶ 9.)  On October 11, 2018, COPS released five more documents—18 pages in total—to LDF.  (Id. ¶ 10.)  Four of the five documents contained redactions subject to FOIA Exemptions 5 and 6.  (Id.)  COPS withheld in full 315 pages of responsive documents, including the drafts of the "assessment and recommendatory" report that COPS was preparing in concert with the Police Foundation.  (Id.)  COPS provided LDF with a draft Vaughn index setting out the bases for redactions of certain documents and the withholding of others.  (Id.)

LDF and defendants then conferred again about the scope of LDF's FOIA request.  LDF clarified that it sought all documents pertaining to the NCPD, not only grant applications or awards.  (Doc 49 ¶ 11.)  In response to this clarification, the COPS Office agreed to search again for documents concerning the NCPD.  (Id.)  On June 3, 2019, COPS released, in part, 7,207 additional pages of documents and a supplemental Vaughn index.  (Id. ¶ 12.)  The

COPS Office withheld certain information from these documents pursuant to FOIA Exemptions 5 and 6.  (Id.)

LDF also requested that COPS re-review the three drafts of the NCPD report and release any segregable factual information.  (Id. ¶ 13.)  COPS agreed to re-review the June 30 Draft for segregable factual information, and to release such material on the following conditions:

1. The COPS Office would only re-review the most recent draft of the report, but not its two prior versions;

2. LDF understood that the explanation provided for the withholding of certain parts of the report pursuant to Exemption 5 still applied; and

3. LDF would not challenge the application of Exemption 5 to the information otherwise withheld in response to its FOIA request up to that juncture.

(Id. ¶ 13.)  LDF agreed to these conditions, and the COPS Office conducted a line-by-line review of the June 30 Draft.  (Id. ¶ 14.)  The COPS Office then released a redacted version of the June 30 Draft, disclosing reasonably segregable factual information and redacting the remaining material pursuant to Exemption 5.  (Id.)  The COPS Office explained that it redacted the June 30 Draft as it did because, inter alia, the document is a 112-page intra-agency draft report that contained preliminary data analysis, initial findings, proposed recommendations, and edits and comments; the report was not finalized; and the withheld factual material was inextricably intertwined with the preliminary assessments and recommendations.  (Id.)  Further, the COPS Office stated that the release of the redacted information would stifle candid discussions and the exchange of ideas between and among government employees and government consultants and contractors, which would in turn hamper the COPS Office's goals.  (Id.)

LDF requested that the COPS Office conduct another line-by-line review of the June 30 Draft to see if any further factual material could be released.  (Id. ¶ 15.)  After COPS

completed another review of the document, DOJ Counsel informed LDF that the COPS Office

had already released all reasonably segregable factual material.  (Id. ¶ 16.)

C.  Procedural History

        LDF filed its initial complaint on May 16, 2018 (Doc 1), and later amended on

June 26, 2018 (Doc 23).  On October 23, 2019, LDF filed a letter that the Court deemed a

request for in camera review of the June 30 Draft.  (Docs 43-44.)  The Court denied LDF's

application for in camera review without prejudice to renewal in the context of summary

judgment motion briefing.  (Doc 46.)

        Defendants filed their motion for summary judgment on December 6, 2019,

appending the Vaughn declaration of Melissa Fieri-Fetrow, Attorney-Advisor in the COPS

Office.  (Docs 48-49.)  LDF opposed the motion and moved for in camera review on January 6,

2020.  (Doc 51.)  Defendants replied on January 21, 2020 and filed a supplemental declaration of

Matthew C. Scheider, Assistant Director of the COPS Office.  (Docs 55-56.)

LEGAL STANDARDS

A.  Summary Judgment

        Summary judgment "shall" be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit

under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A

dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'"  Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d

Cir. 2000) (quoting Anderson, 477 U.S. at 248).  On a motion for summary judgment, the Court

"must construe the facts in the light most favorable to the non-moving party and resolve all

- 7 -

ambiguities and draw all reasonable inferences against the movant."  Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 79-80 (2d Cir. 2009) (internal quotation marks and citation omitted).

"FOIA cases are generally resolved on motions for summary judgment."  Families for Freedom v. U.S. Customs & Border Prot., 837 F. Supp. 2d 331, 335 (S.D.N.Y. 2011); see also Am. Civil Liberties Union v. Office of the Dir. of Nat'l Intelligence, 10 civ. 4419 (RJS), 2011 WL 5563520, at *3 (S.D.N.Y. Nov. 15, 2011) ("Summary judgment pursuant to Rule 56 is the preferred procedural vehicle for resolving FOIA disputes.") (internal quotation marks and citation omitted); Jones-Edwards v. Appeal Bd. of Nat'l Sec. Agency Cent. Sec. Agency, 352 F. Supp. 2d 420, 423 (S.D.N.Y. 2005) (same), aff'd sub nom., Jones-Edwards v. Appeal Bd. of Nat'l Sec. Agency, 196 F. App'x 36 (2d Cir. 2006).  Where an agency moves for summary judgment in a FOIA action, it bears "the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA."  Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994).  The agency satisfies this burden by submitting affidavits or declarations that "indicat[e] that the agency has conducted a thorough search and giv[e] reasonably detailed explanations why any withheld documents fall within an exemption . . . ."  Id.  These affidavits, commonly referred to as Vaughn affidavits,[1] are "accorded a presumption of good faith."  Id. (internal quotation marks and citations omitted); see also Long v. Office of Pers. Mgmt., 692 F.3d 185, 190-91 (2d Cir. 2012) (quoting Carney).

To warrant summary judgment, agency affidavits must "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary

---

[1] See Am. Civil Liberties Union v. Office of the Dir. of Nat'l Intelligence, 2011 WL 5563520, at *3 (noting that agency affidavits are referred to as Vaughn affidavits in FOIA cases).

evidence in the record nor by evidence of agency bad faith.  Ultimately, an agency's justification

for invoking a FOIA exemption is sufficient if it appears logical or plausible."  Wilner v. Nat'l

Sec. Agency, 592 F.3d 60, 73 (2d Cir. 2009) (internal quotation marks and citation omitted);

Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999) (affidavits must "contain

reasonable specificity of detail rather than merely conclusory statements") (internal quotation

marks and citation omitted) (emphasis in original).  To overcome an agency's showing and

defeat a summary judgment motion in a FOIA case, "the plaintiff must make a showing of bad

faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, . . . or

provide some tangible evidence that an exemption claimed by the agency should not apply or

summary judgment is otherwise inappropriate . . . ."  Carney, 19 F.3d at 812 (citations omitted).

B.  FOIA Exemption 5

FOIA "was enacted to facilitate public access to Government documents."  U.S.

Dep't of State v. Ray, 502 U.S. 164, 173 (1991).  There is a "strong presumption in favor of

disclosure [that] places the burden on the agency to justify the withholding of any requested

documents."  Id.  FOIA contains nine statutory exemptions to disclosure, which are "narrowly

construed."  Brennan Ctr. for Justice at N.Y.U. School of Law v. U.S. Dep't of Justice, 697 F.3d

184, 194 (2d Cir. 2012) (internal quotation marks and citation omitted); see 5 U.S.C.

§ 552(b)(1)-(9) (enumerating exemptions).  The agency asserting an exemption to FOIA

disclosure bears the burden of establishing that it applies.  Brennan Ctr. for Justice, 697 F.3d at

194 (citing Nat'l Council of La Raza v. Dep't of Justice, 411 F.3d 350, 356 (2d Cir. 2005)).

Further, the agency "shall withhold information . . . only if the agency reasonably foresees that

disclosure would harm an interest protected by an exemption . . . ."  5 U.S.C. § 552(a)(8)(A)(i).

The agency must therefore demonstrate "how a particular Exemption 5 withholding would harm

the agency's deliberative process." <u>Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency</u>, 17 cv 5928 (JMF), 2019 WL 4142725, at *5 (S.D.N.Y. Aug. 30, 2019) (internal quotation marks and citation omitted).

The purpose of Exemption 5 "is to prevent injury to the quality of agency decisions." <u>N.L.R.B. v. Sears, Roebuck & Co.</u>, 421 U.S. 132, 151 (1975).  "The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions . . . by protecting open and frank discussion among those who make them within the Government . . . ." <u>Dep't of Interior v. Klamath Water Users Protective Ass'n</u>, 532 U.S. 1, 8-9 (2001) (internal quotation marks and citations omitted).

Section 552(b)(5) exempts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency . . . ."  5 U.S.C. § 552(b)(5).  This exemption creates a "deliberative process privilege." <u>Klamath Water Users</u>, 532 U.S. at 8.  "To qualify, a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." <u>Id</u>.  Documents prepared by an outside consultant assisting a government agency may still come within Exemption 5. <u>Lead Indus. Ass'n, Inc. v. Occupational Safety & Health Admin.</u>, 610 F.2d 70, 83 (2d Cir. 1979) ("[I]n our view, nothing turns on the point that the . . . reports were prepared by outside consultants . . . rather than agency staff."); <u>see</u> <u>also</u> <u>Tigue v. U.S. Dep't of Justice</u>, 312 F.3d 70, 77 (2d Cir. 2002) ("In considering the scope of Exemption 5, this Circuit has recognized that agencies may require assistance from outside

consultants in formulating policy, and has held that 'nothing turns on the point that . . . reports were prepared by outside consultants . . . .'" (quoting Lead Indus., 610 F.2d at 83)).

Documents exempt from disclosure under the deliberative process privilege must be both "predecisional" and "deliberative."  A document is predecisional if it is "prepared in order to assist an agency decisionmaker in arriving at his decision."  Hopkins v. U.S. Dep't of Housing & Urban Dev., 929 F.2d 81, 84 (2d Cir. 1991) (internal quotation marks and citation omitted).  A deliberative document is one that is "actually . . . related to the process by which policies are formulated."  Id. (internal quotation marks and citation omitted, alteration in original).  "The privilege protects recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  Grand Cent. P'ship, 166 F.3d at 482 (internal quotation marks and citation omitted).

Exemption 5 "does not, as a general matter, extend to purely factual material." Hopkins, 929 F.2d at 85.  "Reasonably segregable" factual information must be disclosed.  Id. (quoting 5 U.S.C. § 552(b)).  Where, however, "factual observations are 'inextricably intertwined' with the privileged opinions and recommendations such that disclosure would compromise the confidentiality of deliberative information that is entitled to protection under Exemption 5," withholding such non-segregable factual information is proper.  Id. (internal quotation marks and citation omitted).

C.  In-Camera Review

FOIA provides that district courts "may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) . . . ."  5 U.S.C. § 552(a)(4)(B).  In camera

review, however, "is considered the exception, not the rule, and the propriety of such review is a matter entrusted to the district court's discretion."  Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. N.L.R.B., 845 F.2d 1177, 1180 (2d Cir. 1988); N.Y. Times Co. v. U.S. Dep't of Justice, 872 F. Supp. 2d 309, 315 (S.D.N.Y. 2012) (same).  Courts have found in camera review of agency documents in dispute in FOIA actions appropriate where, for example, "the record is vague or the agency claims too sweeping," Hopkins, 929 F.2d at 86 (internal quotation marks and citation omitted); the agency's affidavits are "contradicted by other evidence in the record;" or "when the requested documents are few in number and of short length" such that "in camera review may save time and money."  Adelante Ala. Worker Ctr. v. U.S. Dep't of Homeland Sec., 376 F. Supp. 3d 345, 360 (S.D.N.Y. 2019) (internal quotation marks and citations omitted).

DISCUSSION

          For the reasons set forth below, defendants' motion for summary judgment will be granted.

    A.  The June 30 Draft Comes Within the Deliberative Process Privilege

          The Court does not defer to the agency's assertion of an exemption, but "decides de novo whether the agency has sustained its burden."  Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys., 601 F.3d 143, 147 (2d Cir. 2010) (citing 5 U.S.C. § 552(a)(4)(B); U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989)).  At the outset, the June 30 Draft, prepared by the Police Foundation as the technical assistance provider to the COPS Office on the NCPD CRI-TA engagement, is an intra-agency document. See Tigue, 312 F.3d at 77.  Therefore, the "source" of the June 30 Draft is a government agency, which satisfies the first condition of properly invoking the Exemption.  Klamath Water Users, 532 U.S. at 8.

- 12 -

The second requisite condition is whether the Draft comes "within the ambit of privilege against discovery under judicial standards that would govern litigation against the agency that holds it." Id. Here, this is a question of whether the June 30 Draft is subject to the "deliberative process" privilege. Id. ("[T]hose privileges include the privilege for attorney work-product and what is sometimes called the 'deliberative process' privilege."); see Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency, 954 F.3d 150, 155 (2d Cir. 2020) ("In order for the privilege to apply, the agency record at issue must be (1) an inter-agency or intra-agency memorandum or letter; (2) pre-decisional; and (3) deliberative."). The "deliberative process covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated . . . ." Klamath Water Users, 532 U.S. at 8 (internal quotation marks and citation omitted). To be subject to this privilege, the June 30 Draft must be predecisional and deliberative. Grand Cent. P'ship, 166 F.3d at 482. The Court finds that it is both.

"Drafts and comments on documents are quintessentially predecisional and deliberative." Nat'l Council of La Raza v. Dep't of Justice, 339 F. Supp. 2d 572, 583 (S.D.N.Y. 2004). A document is predecisional if it was "prepared in order to assist an agency decisionmaker in arriving at his decision." Grand Cent. P'ship, 166 F.3d at 482 (internal quotation marks and citation omitted). Where an "agency can [also] (i) pinpoint the specific agency decision to which the document correlates . . . and (ii) verify that the document precedes, in temporal sequence, the decision to which it relates," this is further evidence that a document is predecisional. Id. (internal quotation marks and citation omitted, alteration in original). The June 30 Draft was prepared for the express purpose of assisting the COPS Office in assessing the NCPD and how the NCPD could improve its policing practices. (Doc 49 ¶¶ 35-36.) The Draft

temporally precedes any decision by the COPS Office as to what to include in the finalized report, and whether to adopt the final report as COPS's official recommendation to the NCPD. (Id. ¶ 36.)  These decisions were never reached because the CRI-TA program ended its work on the NCPD engagement before the June 30 Draft was finalized.  (Id. ¶¶ 29-30.)  Even where a draft never becomes final, the draft version remains predecisional.  See Am. Civil Liberties Union v. U.S. Dep't of Justice, 844 F.3d 126, 133 (2d Cir. 2016) (finding draft op-ed article protected under Exemption 5 even where the article was never published); Color of Change v. U.S. Dep't of Homeland Sec., 325 F. Supp. 3d 447, 454 (S.D.N.Y. 2018) (noting that the argument "that the last version of the draft paper became 'final' . . . has been rejected by both the Second and D.C. Circuits.").

            The June 30 Draft is also deliberative.  Deliberative documents are those that are "actually . . . related to the process by which policies are formulated," Grand Cent. P'ship, 166 F.3d at 482 (internal quotation marks and citation omitted), and "reflect[] the give-and-take of the consultative process."  Nat'l Res. Def. Council, 954 F.3d at 156 (internal quotation marks and citation omitted).  Courts have considered "factors such as whether the document (i) formed an essential link in a specified consultative process, (ii) reflect[s] the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency."  Grand Cent. P'ship, 166 F.3d at 482 (internal quotations marks and citation omitted, alteration in original).  The June 30 Draft reflects the then-ongoing collaboration between the Police Foundation and COPS on a document that contains preliminary assessments, initial findings, and proposed recommendations, along with notes and comments by the drafters.  (Doc 49 ¶¶ 37-38.)  The Draft was subject to change, and its contents had not been verified.  (Id. ¶ 40.)  Such a draft document reflects the thought

processes and the "give-and-take" of the agency and its outside consultant, rendering it deliberative and protected by Exemption 5.  Nat. Res. Def. Council, 954 F.3d at 156.

While the Court finds that as an intra-agency draft document that is both predecisional and deliberative, the June 30 Draft falls squarely within the type of documents protected by Exemption 5, Grand Cent. P'ship, 166 F.3d at 482, this does not end the inquiry. Hopkins, 929 F.2d at 85.  LDF contends that the government has improperly redacted factual information that is not subject to the privilege and that in camera review of the Draft is therefore warranted.  The Court rejects these arguments.

B.  The Government Properly Redacted the June 30 Draft

Exemption 5 does not protect "purely factual material."  Hopkins, 929 F.2d at 85. In order to be protected under Exemption 5, factual material must be "inextricably intertwined with the privileged opinions and recommendations such that disclosure would compromise the confidentiality of deliberative information . . . ."  Id. (internal quotation marks and citation omitted).  The government bears the burden of establishing that factual material is properly withheld.  Id.

i.   Redacted Factual Information is Inextricably Intertwined with Privileged Opinions and Recommendations

The government conducted two line-by-line reviews of the June 30 Draft to determine which material was segregable and therefore could be disclosed without compromising agency deliberative process.  (Doc 49 ¶ 42; Scheider Decl. (Doc 56) ¶ 6.)  The COPS Office determined, however, that the "vast majority" of the factual material in the June 30 Draft was inextricably intertwined with deliberative information, and heavily redacted the document.  (Doc 56 ¶ 3.)  The government submits that these redactions are nonetheless proper because (1) the very selection and inclusion of these facts reflect the subjective—and

- 15 -

preliminary—judgment of the Draft's authors, (Doc 49 ¶¶ 43-44; Doc 56 ¶¶ 4-5); and (2) the facts themselves were subject to change and later verification that never occurred.  (Doc 49 ¶ 40; Doc 56 ¶ 3.)

        First, the selection and organization of factual material is protectable under Exemption 5 where the choice to include particular factual information would disclose the agency's deliberative process.  Courts have found the inclusion of particular facts to "demonstrate [an agency's] deliberative process" where "[t]hey show the authors' judgment in cull[ing] the relevant documents, extract[ing] pertinent facts, [and] organiz[ing] them to suit a specific purpose."  Color of Change, 325 F. Supp. 3d at 455 (internal quotation marks and citation omitted, latter alterations in original); Lead Indus., 610 F.2d at 85 ("Disclosing factual segments from the . . . summaries would reveal the deliberative process of summarization itself by demonstrating which facts in the massive [] record were considered significant . . . ."); cf. Nat. Res. Def. Council, 954 F.3d at 157 (finding that release of EPA's "core model" "would not explain the factors that prompted development of a tool, nor would it expose rationales cutting against or in favor of its use.").

        The factual material that the Police Foundation and the COPS Office included in the June 30 Draft would reveal what the government considered significant to the project during the preliminary stages of creating the NCPD recommendation.  (Doc 49 ¶ 44.)  As Scheider's declaration describes, the factual material in the June 30 Draft "is the result of the Police Foundation using its independent judgment to select facts, out of a larger pool of facts, that, in its view, are significant and should be considered in developing recommendations."  (Doc 56 ¶ 4.)  Further, the presentation of particular gathered data summarized in charts and other figures created by the Police Foundation indicate which factors the Police Foundation and/or COPS may

have considered when analyzing certain data, which implicates the deliberative process.  (Doc 49 ¶¶ 40-41.)  The inclusion of particular information here depended on the subjective judgment of the drafters, and would reveal what they considered significant at a particular, preliminary stage of the drafting process.  (Doc 56 ¶ 5.)

Further, the COPS Office previously released the information it determined to be segregable.  (Doc 56 ¶ 6.)  After this initial disclosure, COPS conducted a second line-by-line review of the June 30 Draft at LDF's request, and confirmed that all reasonably-segregable information had been disclosed.  (Doc 49 ¶¶ 15-16.)  This demonstrates that defendants have, "in good faith, been willing to conduct further reviews at the request of the plaintiff . . . ."  Gonzalez v. U.S. Citizenship & Immigration Servs., __ F. Supp. 3d __, 19 cv 2911 (JGK), 2020 WL 4343872, at *13 (S.D.N.Y. July 29, 2020).

LDF contends that the selection and inclusion of particular factual information in the June 30 Draft is not a basis to redact this material because any report, by its nature, requires culling and summarizing data.  (Pl.'s Mem. Law (Doc 52) at 7-8.)  While this may be true, the June 30 Draft was not a recitation of facts prepared solely to "inform" a decisionmaker; rather, the report was part of a collaborative effort aimed at assessing NCPD's practices, making recommendations, and suggesting improvements.  See N.Y. Times Co. v. U.S. Dep't of Justice, 16 cv 6120 (RMB), 2017 WL 4712636, at *20 (S.D.N.Y. Sept. 29, 2017) (distinguishing Playboy Enters., Inc. v. Dep't of Justice, 677 F.2d 931 (D.C. Cir. 1982), where the report there was "not submitted to the agency . . . to assist it in rendering an informed decision upon the . . . record.") (internal quotation marks and citation omitted); (Doc 49 ¶ 35.)  The Police Foundation made "preliminary determination[s] of which pieces of data were relevant to the analysis of a particular NCPD policy," and "selected these facts from the pool of data it had compiled from

various sources . . . ."  (Doc 49 ¶ 39.)  Where, as here, the factual material chosen by consultants to be included required "draw[ing] inferences and weigh[ing] the evidence," its disclosure would implicate the deliberative process, and thus the facts are properly redacted pursuant to Exemption 5.  <u>Lead Indus.</u>, 610 F.2d at 83; <u>see</u> <u>N.Y. Times Co.</u>, 2017 WL 4712636, at *20 ("Disclosing factual material within the threat assessments would 'reveal the deliberative process of selection' by demonstrating which facts in the record were 'considered significant.'") (citing <u>Lead Indus.</u>, 610 F.2d at 85).

LDF further argues that because the government already disclosed the objectives of the COPS Office assessment and the factors that would be considered, it cannot now claim that the June 30 Draft comes within Exemption 5.  (Doc 52 at 8-9.)  This argument appears to conflate the contents of the documents already made public with those of the June 30 Draft.  In fact, the "Memorandum of Agreement" and the "Goal and Objectives Statement" to which LDF points are unredacted in the appendix of the June 30 Draft.  (<u>See</u> Johnson Decl. (Doc 53), Ex. A at 102-106.)  The June 30 Draft does more than recite the objectives of the project; it provides a "preliminary analysis of the areas that were to be assessed pursuant to the NCPD-CRI-TA" engagement, and contains preliminary recommendations, certain data, figures, charts, and tables created by the Police Foundation.  (Doc 49 ¶¶ 31, 35, 41; Doc 56 ¶¶ 4-5.)  The selection and inclusion of particular facts and data in a draft version of the report is distinct from lists of factors, goals, and objectives; the former reflects the subjective judgment of the drafters and their deliberative processes, while the latter contemplates what the draft report could include, not what it actually did include.

<u>Second</u>, the facts included in the June 30 Draft were subject to change and further verification.  (Doc 49 ¶¶ 31, 40; Doc 56 ¶ 3.)  The June 30 Draft only reached the seventh stage

of a 17-step review process, and work stopped on the Draft before it was ever made final.  (Doc 49 ¶ 40; Doc 56 ¶ 3.)  Scheider submits that the twelfth stage of the process involved "collaborative conferences" that could have "identified deficiencies and inaccuracies in factual information used to support the recommendation, resulting in revision and/or removal of not only the supportive factual information but of entire recommendations themselves."  (Doc 56 ¶ 3.)  Indeed, Fieri-Fetrow states that the facts in the Draft would not have been verified until the thirteenth or fourteenth step of the process.  (Doc 49 ¶ 40.)  Given the preliminary stage at which work on the June 30 Draft ended, it may be imprecise to refer to "facts" in the draft report, as even this information was subject to further revision and confirmation.  Facts and opinions were thus inextricably intertwined at this early stage of the drafting and review process: facts themselves could have been revised and in turn, the recommendations they supported may have been edited or deleted.  Because the 17-step review process of the June 30 Draft was halted, which factual material—and in turn, which recommendations—would have been subject to revision or removal is unknowable.  Therefore, the information that LDF submits should be disclosed had not attained the status of "facts," as distinguished from suppositions, and thus would not be subject to the "inextricably intertwined" and "reasonably segregable" analyses.

ii.  It is Reasonably Foreseeable That Harm Would Result from Additional <u>Disclosure</u>

FOIA requires the withholding agency to "reasonably foresee[] that disclosure would harm an interest protected by an exemption . . . ."  5 U.S.C. § 552(a)(8)(A)(i)(I).  The agency must demonstrate "how a particular Exemption 5 withholding would harm the agency's

deliberative process." Nat. Res. Def. Council, 2019 WL 4142725, at *5 (internal quotation marks and citation omitted). The government has made such a showing here.

It is reasonably foreseeable that harm would result from disclosure of the redacted portions of the June 30 Draft. First, disclosure of unconfirmed suppositions in the draft could be misleading. The June 30 Draft's contents were subject to several further stages of review and revision, including for possible factual errors, and the report does not, in the state in which it was left, reflect the actual views, opinions, or recommendations of the COPS Office. Release of such material could therefore negatively affect the relationship of the NCPD with the communities it serves. (Doc 56 ¶ 9; Doc 49 ¶ 45.)

Second, as Scheider explains in his declaration, even though the NCPD CRI-TA engagement ended, the CRI-TA program is itself ongoing. (Doc 56 ¶ 7.) The program relies on the voluntary engagement of law enforcement agencies requesting the assistance of the COPS Office, and requires the free exchange of information and feedback between and among COPS, technical assistance providers, and law enforcement agencies. (Id.) Law enforcement may be hesitant to approach the COPS Office and engage in such deliberative processes if such information could be released to the public at preliminary stages. (Id. at ¶¶ 7-8.) Additional disclosure may have a chilling effect both on law enforcement's willingness to engage in free and frank discourse with the COPS Office, and among the COPS Office itself. (Id. ¶ 8; Doc 49 ¶ 45.) This would, in turn, hamper the COPS Office's goals of addressing concerns with and improving law enforcement practices and policies, and advancing overall public safety. (Doc 56 ¶ 7.)

C.  Plaintiff's Motion for In Camera Review is Denied

    i.    LDF Does Not Make a Showing of Agency Bad Faith or Otherwise Impugn the Government's Submissions

Agency affidavits are afforded a presumption of good faith, and summary judgment on the basis of these affidavits is appropriate where "the agency's submissions are adequate on their face." Carney, 19 F.3d at 812; see id. ("Affidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden."). Once the government has met this burden, "the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, . . . or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate . . . ." Id. (citations omitted). LDF has failed to do so here.

LDF has not come forward with any evidence to suggest that either the Fieri-Fetrow or Scheider declaration was made in bad faith, nor does LDF provide "tangible evidence" that would permit the Court to conclude that summary judgment would be inappropriate. Here, the Fieri-Fetrow and Scheider declarations establish that the government undertook a thorough search and that the June 30 Draft comes within Exemption 5. (See Doc 49 ¶¶ 6-7; 10-17; Doc 56 ¶¶ 3-6.) Indeed, during the course of the review process, LDF agreed to the COPS Office's conditions for re-reviewing the draft reports, one of which was that "LDF understands that the explanation for the application of Exemption 5 to the draft report continues to apply to those portions of the report that remain withheld following re-review . . . ." (Doc 49 ¶ 13.) LDF does not now challenge this "condition" of the COPS Office's re-review of the Draft. Further, defendants' declarations explain the kinds of information redacted, and why the redactions to the

June 30 Draft are necessary and appropriate.  (See, e.g., Doc 49 ¶¶ 39-45; Doc 56 ¶¶ 3-9.)  For

these reasons, the Court finds that the government has satisfied its burden and that plaintiff has

failed to overcome it with a contrary showing.  See Carney, 19 F.3d at 813 ("Suffice it to say, the

declarations are reasonably detailed and reveal that [the agency] undertook a diligent search . . . .

With respect to the withheld documents, the declarants describe the documents or classes of

documents withheld and explain why they fall within an applicable exception.").

> ii.    In-Camera Review is Not Warranted

In camera review is the exception rather than the rule in FOIA cases.  Local 3,

Int'l Bhd. of Elec. Workers, 845 F.2d at 1180.  Courts have found such review necessary where,

for example, the information in the government's affidavits was contradicted by other evidence

in the record.  Am. Civil Liberties Union v. F.B.I., 59 F. Supp. 3d 584, 589 (S.D.N.Y. 2014);

Adelante, 376 F. Supp. 3d at 360 (quoting Am. Civil Liberties Union v. F.B.I., 59 F. Supp. 3d at

589).  Such review may also be appropriate where "the agency fails to provide a sufficiently

detailed explanation" to justify its claimed exemption, Seife v. U.S. Dep't of State, 298 F. Supp.

3d 592, 630 (S.D.N.Y. 2018), and/or where the documents at issue are "few in number and of

short length . . . ."  Adelante, 376 F. Supp. 3d at 360 (internal quotation marks and citation

omitted).  Where, as here, an agency's redactions of a document are at issue:

> [A] government agent can attest in a sworn affidavit that the redactions are
> necessary, and elaborate on the reasons for the redactions with sufficient
> specificity, the district court should be able to rule on the appropriateness of the
> redactions without conducting an in camera review of the redacted materials.
> However, while on the one hand, too much specificity on the part of the
> government can actually reveal the classified information, too little specificity can
> render judicial review of the agency's decisions all but impossible.

Halpern v. F.B.I., 181 F.3d 279, 287 (2d Cir. 1999).

In camera review is not warranted here.  As discussed supra, the government's representations in the Fieri-Fetrow and Scheider declarations have not been contradicted by other evidence.  While the June 30 Draft is the sole remaining document at issue, it is a 112-page report, and the Court's review of it in camera would not promote efficiency.  Cf. Adelante, 376 F. Supp. 3d at 360 (finding in camera review appropriate where the document at issue was "a scant five pages in length" and plaintiffs pointed to evidence in the record showing the government's contrary representations to Congress and to the court).

In camera review is not necessary for the Court to determine the appropriateness of the redactions to the June 30 Draft.  For the reasons set forth above, the Court finds that the Fieri-Fetrow and Scheider declarations sufficiently explain the reasons for the redactions in the Draft report.  The June 30 Draft contains preliminary recommendations and unconfirmed factual material, and reflects the then-ongoing "give-and-take" between the COPS Office and the Police Foundation.  (Doc 49 ¶¶ 31, 35, 38.)  LDF emphasizes Fieri-Fetrow's statement that "[m]uch of the factual material in the draft assessment report is contained within passages evaluating that material and is thus inextricably intertwined with the preliminary assessments, initial findings, and proposed recommendations."  (Doc 49 ¶ 43; Doc 52 at 14.)  LDF argues that this does not mean "all" factual material is thus inseparable from the deliberative process, such that in camera review is warranted.  (Doc 52 at 14.)  This argument, however, fails to account for the facts that: (1) the government twice conducted a line-by-line review of the June 30 Draft, and released what it deemed to be reasonably segregable factual information (Doc 49 ¶¶ 16, 42); and (2) the "facts" allegedly contained in the June 30 Draft may not be accurately described as "facts," as they were subject to further revision, confirmation, and even deletion.  (Id. ¶ 40; Doc 56 ¶¶ 3, 9.) Defendants have established that given the stage at which work on the June 30 Draft stopped,

additional disclosure would reveal the agency's deliberative process, which is what Exemption 5 is designed to protect.

       For these reasons, plaintiff's motion for <u>in camera</u> review will be denied.

CONCLUSION

       For the reasons set forth above, defendants' motion for summary judgment is GRANTED and plaintiff's motion for <u>in camera</u> review is DENIED.  The Clerk is respectfully directed to terminate the motions (Docs 48, 51), to enter final judgment, and to close this case.

       SO ORDERED.

                         P. Kevin Castel
                   United States District Judge

Dated:  New York, New York
       September 2, 2020